FILED
CLERK, U.S. DISTRICT COURT

02/10/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ GSA _____ DEPUTY

MARIS K.V. SNELL, FL Bar No. 125585
msnell@ftc.gov
ADRIENNE JENKINS, OH Bar No. 0089568
ajenkins@ftc.gov
Federal Trade Commission
1111 Superior Avenue, Suite 200
Cleveland, OH 44114
Tel: (202) 660-8544
Fax: (216) 263-3426

MILES D. FREEMAN, Cal. Bar No. 299302
mfreeman@ftc.gov
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Tel: (310) 824-4300
Fax: (310) 824-4380

*Attorneys for Plaintiff Federal Trade Commission*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> GROWTH CAVE, LLC, also d/b/a BUFFALO BRIDGE CAPITAL, LLC and PASSIVEAPPS, a Delaware limited liability company; <br><br> APEX MIND, LLC, a Colorado limited liability company; | Case No. 2:25-CV-01115-DDP- (RAOx) <br><br> **COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |

LUCAS LEE-TYSON, individually and as an officer and/or owner of GROWTH CAVE, LLC;

OSMANY BATTE, aka OZZIE BLESSED, individually and as an officer of GROWTH CAVE, LLC and APEX MIND, LLC; and

JORDAN MARKSBERRY, individually and as an officer of GROWTH CAVE, LLC and APEX MIND, LLC,

Defendants.

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.    The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); the FTC's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Business Opportunities" ("Business Opportunity Rule" or "Rule"), 16 C.F.R. Part 437, as amended; the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679; and the FTC's Trade Regulation Rule on the Use of Consumer Reviews and Testimonials ("Reviews and Testimonials Rule"), 16 C.F.R. Part 465. For these violations, the FTC seeks relief, including a temporary, preliminary, and permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b; the Business Opportunity Rule; CROA; and the Reviews and Testimonials Rule. The amended Business Opportunity Rule became effective on March 1, 2012, and has since that date remained in full force and effect.

## SUMMARY OF THE CASE

2.      This case is about Defendants' illegal promotion and sale of business opportunities and a credit repair system that have caused thousands of consumers across the country approximately $50 million in harm.

3.      Through Defendant Growth Cave, LLC ("Growth Cave"), Defendant Lucas Lee-Tyson ("Lee-Tyson") has been deceptively marketing business opportunities and educational programs since at least 2021. After his "Productized Profits" program began receiving consumer complaints, Lee-Tyson transitioned into marketing the Knowledge Business Accelerator ("KBA") program, a business opportunity that supposedly helps purchasers to develop and market a "digital education program" on the topic of their choice and sell it to third parties online through targeted YouTube advertisements.

4.      By early-to-mid-2022, Defendants Osmany Batte ("Batte") and Jordan Marksberry ("Marksberry") were working alongside Lee-Tyson (collectively, "Individual Defendants") to sell the KBA business opportunity and a costly "done-for-you" upsell service for KBA purchasers, known as Digital Freedom Mastermind ("DFM"), as well as a second business opportunity, Cashflow Consulting Academy ("CCA"), which supposedly allows purchasers to make tens of thousands of dollars monthly by calling and texting prospective customers on behalf of Growth Cave or its network of businesses.

5.      To entice consumers to purchase their business opportunities, Lee-Tyson and Batte promote themselves as marketing experts who have made millions using sales techniques that are guaranteed to earn significant income for purchasers of Growth Cave's programs. Individual Defendants and Growth Cave ("Growth Cave Defendants") claim that Growth Cave's programs have already helped thousands of people earn millions of dollars. Growth Cave Defendants claim that by using their programs, consumers will quickly and easily be able to create a

profitable business.

6.     Consumers have purchased Growth Cave's business opportunities and related services for $3,500 to $50,000 each.

7.     Growth Cave Defendants' claims are false. The promised gains rarely, if ever, materialize, leaving purchasers of the business opportunities with depleted bank accounts, hefty credit card bills, and high-interest loans.

8.     The Growth Cave Defendants, recognizing the financial distress of KBA and CCA purchasers, seized the opportunity to market and sell to them a purported credit repair and 0% interest business-funding program, Buffalo Bridge Capital, LLC ("Buffalo Bridge"), which is an unincorporated d/b/a of Growth Cave. Consumers paid thousands of dollars each for Growth Cave's help to repair their credit scores and procure 0% interest loans to support their KBA or CCA businesses, only to have Growth Cave Defendants instruct them to apply for multiple "business credit cards," causing them to rack up credit inquiries and fall even deeper into debt, without ever receiving the promised credit repair assistance.

9.     Numerous dissatisfied purchasers of the business opportunities and credit repair service have contacted Growth Cave Defendants to complain that they did not receive the promised assistance or income, to cancel their agreements, and to obtain a refund, but Growth Cave Defendants have ignored or declined their requests.

10.     Despite the hundreds of complaints about Growth Cave Defendants' deceptive business practices that consumers have submitted directly to Growth Cave Defendants and to consumer protection agencies, the Better Business Bureau ("BBB"), and other channels, Growth Cave Defendants have not ceased their misconduct and instead have re-branded and continued marketing essentially the same business opportunities under new names. Lee-Tyson continues to operate Growth Cave, now marketing PassiveApps, a business opportunity with striking

similarities to KBA. Batte and Marksberry are running a new company, Defendant Apex Mind, LLC ("Apex Mind"), which is selling a re-packaged version of Growth Cave's CCA business opportunity.

11. Defendants' schemes are ongoing, defrauding consumers of tens of millions of dollars, in violation of the FTC Act, the Business Opportunity Rule, CROA, and the Reviews and Testimonials Rule.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

14. The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Business Opportunity Rule, 16 C.F.R. Part 437, as amended, which requires specific disclosures and prohibits certain misrepresentations in connection with the sale of a business opportunity, CROA, 15 U.S.C. § 1679, et seq., which prohibits untrue or misleading representations to induce the purchase of credit repair services, requires certain affirmative disclosures in the offering or sale of credit repair services, and prohibits credit repair organizations from charging or receiving money for the performance of credit repair services before such services are fully performed, and the Reviews and Testimonials Rule, 16 C.F.R. Part 465, which requires specific disclosures and prohibits certain misrepresentations in connection with reviews and testimonials.

1

**DEFENDANTS**

2

15.    Defendant Growth Cave, also doing business under various fictitious

3    names, including GrowthCave.com, Ozzie Blessed, Buffalo Bridge,

4    PacificWealthClub.com, PassiveApps, and PassiveApps.com, is a Delaware

5    limited liability company with its principal place of business at 19333 Rosita St.,

6    Tarzana, CA 91356. Growth Cave, in connection with the matters alleged herein,

7    entered into contracts with and received payments from consumers for business

8    opportunities and other related products and services, including credit repair

9    services under its d/b/a Buffalo Bridge. In connection with the matters alleged

10    herein, Growth Cave transacts or has transacted business in this District and

11    throughout the United States. At all times relevant to this Complaint, acting alone

12    or in concert with others, Growth Cave has advertised, marketed, distributed, or

13    sold business opportunities and other related products and services to consumers

14    throughout the United States.

15

16    16.    Defendant Apex Mind is a Colorado limited liability company with its

17    principal place of business at 1880 Office Club Pt., Colorado Springs, CO 80920.

18    Apex Mind, in connection with the matters alleged herein, seeks payments from

19    consumers for business opportunities and other related products and services. In

20    connection with the matters alleged herein, Apex Mind transacts or has transacted

21    business in this District and throughout the United States. At all times relevant to

22    this Complaint, acting alone or in concert with others, Apex Mind has advertised,

23    marketed, distributed, or sold business opportunities and other related products and

24    services to consumers throughout the United States.

25    17.    Defendant Lucas Lee-Tyson is the founder and co-Chief Executive

26    Officer of Growth Cave. He is a signatory on the bank accounts for Growth Cave.

27    Lee-Tyson narrates marketing videos and sends marketing emails for Defendants'

28    business opportunities using false and unsubstantiated claims, including claims

about likely earnings. He is a contact person for Growth Cave's payment processor and is aware of the company's suspension for high chargebacks and the eventual termination of its merchant account. He executes contracts on behalf of Growth Cave. He registers and renews the domain names for Growth Cave and affiliated programs and entities, including Buffalo Bridge, OrcaBoost, and PassiveApps. He communicates with Growth Cave customers and is aware of consumer complaints and requests for refunds, and he has denied and rejected same. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Growth Cave, including the acts and practices described in this Complaint. Defendant Lee-Tyson resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

18.     Defendant Osmany Batte, who conducts all relevant business activities using the alias "Ozzie Blessed," is a co-Chief Executive Officer of Growth Cave, alongside Lee-Tyson. Batte narrates marketing videos and sends marketing emails for Defendants' business opportunities using false and unsubstantiated claims, including earnings claims. He communicates with Growth Cave customers and he is aware of consumer complaints and requests for refunds from deceived consumers. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Growth Cave, including the acts and practices described in this Complaint. Defendant Batte is also the founder and Chief Executive Officer of Apex Mind. Defendant Batte narrates marketing videos and sends marketing emails to consumers regarding Apex Mind's business opportunity. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or

participated in the acts and practices of Apex Mind, including the acts and practices described in this Complaint. Defendant Batte resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

19.    Defendant Jordan Marksberry is the Operations Manager of Growth Cave. He speaks with Growth Cave customers and is aware of consumer complaints against Growth Cave, including the BBB's alert regarding a pattern of complaints against Growth Cave. Marksberry is the Growth Cave representative primarily responsible for responding to consumer complaints to the BBB, and he routinely denies consumer requests to cancel and obtain a refund. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Growth Cave, including the acts and practices described in this Complaint. Defendant Marksberry is the Operations Manager of Apex Mind and he narrates marketing videos regarding Apex Mind's business opportunity. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Apex Mind, including the acts and practices described in this Complaint. Defendant Marksberry resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMERCE

20.    At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## GROWTH CAVE DEFENDANTS' BUSINESS ACTIVITIES

21.    Growth Cave Defendants have deceptively advertised, marketed,

distributed, promoted, and sold business opportunities and credit repair services to consumers throughout the United States.

22.     Lee-Tyson and Batte spearhead the operation of Growth Cave's California-based scheme.

23.     Lee-Tyson claims to have founded Growth Cave as a "broke and lazy college student." Lee-Tyson, now 26 years old, portrays himself as a marketing guru and self-made millionaire.

24.     Batte shares a similar rags-to-riches story, describing how he departed Cuba for the United States in the 1980 Mariel Boatlift, then joined a gang as a child on the streets of Los Angeles before he made millions in real estate and lost it all in the 2008 recession. Batte implies that he is largely responsible for Growth Cave Defendants' success, in part due to his ability to fix negative "mindsets" and his certification in hypnosis.

25.     Individual Defendants claim that the "exact same strategies" used in Growth Cave's business opportunities earn Growth Cave Defendants $60 million per year. Individual Defendants feature prominently in Growth Cave's advertisements on Instagram, TikTok, Facebook, and YouTube.

26.     All three Individual Defendants flaunt their luxurious lifestyles on social media, posting pictures of their lavish vacations and videos of the Growth Cave team "buying $300,000 of watches with Ozzie Blessed," Lee-Tyson "buying a Ferrari for my 25th birthday," and living in a mansion in L.A. They imply that purchasers of their opportunities can reach the same level of success. In fact, Individual Defendants fund their lavish lifestyles using the money unsuspecting consumers pay for Growth Cave's deceptive business opportunities.

### Growth Cave Defendants' Digital Education Business Opportunity:

#### *The KBA Program*

27.     KBA is a digital education business opportunity sold by Growth Cave

Defendants. Growth Cave Defendants represent that they will help purchasers of the KBA business opportunity set up an online educational course to sell to customers for hundreds or thousands of dollars. Growth Cave Defendants represent that they will help KBA purchasers find customers using their "proven" method of posting targeted advertisements on YouTube. KBA purchasers have attempted to create educational courses for relationship advice, investing, real estate, exercise, skincare, building a business, learning a language, life coaching, and many other topics.

28.    Most prospective purchasers first learn of Growth Cave and its KBA business opportunity through videos posted on YouTube, Facebook, Instagram, and other sites. Many of the videos feature Lee-Tyson talking about his journey from starting off as a broke college student to raking in millions of dollars by selling "digital products" online. A typical video advertisement features Lee-Tyson talking into the camera about the money that can easily be earned online using his YouTube sales techniques, as shown in the below screenshot:



29.    Lee-Tyson claims to have "cracked the code" and learned to "generate

10

millions of dollars in automated income like clockwork." According to Lee-Tyson, the KBA business opportunity implements his "proven system"—selling a course through YouTube using keywords tailored to people who would be interested in buying a course on that topic—to earn "safe, reliable, passive income" online. Lee-Tyson's videos state that KBA will help purchasers launch and sell an online course within a few days or weeks, generating "$20,000–$50,000 per month in passive income." He explains that KBA's strategies work because there are "likely THOUSANDS of people out there who would pay for a course on a topic you're knowledgeable or passionate about."

30.     As shown in the below example screenshots from Growth Cave Defendants' marketing videos, they portray the KBA opportunity as a low-risk way to earn "a consistent $10K - $50K+ per month as quickly as possible."



11



31.    Lee-Tyson underscores this point by claiming he has already helped "over 2,000 clients create and sell" courses and that individuals he is working with are "currently making anywhere from $10,000 to even $100,000 a month in automated income." These videos feature impressive testimonials from Growth Cave "clients" who have supposedly been very successful, including Dale, who made "over $40,000 in his very first 30 days," Willie, who collected $65,928 in the first week of his launch, and Andrew Imbesi, who "did $56,000 in a single month." An exemplary screenshot from a video testimonial showing Andrew Imbesi is shown below:




32.     At the end of these video advertisements, prospective purchasers are instructed to click a link for more information on the "exclusive opportunity to have my team build your online course for you. Literally do all of the work . . . to potentially make you $5,000, $10,000, or even $20,000 per month in passive income without you having to lift a single finger."

33.     Prospective purchasers who click the link beneath the video advertisements are routed to a website where they can input their name and email address to sign up to obtain more information regarding Growth Cave Defendants' programs. Thereafter, they are bombarded with marketing emails from Growth Cave Defendants on a nearly daily basis. These emails have eye-catching titles, like "YouTube owes you $800," "$3k/month from YouTube with no videos," "Read if you want to make 20k/month on YouTube without making videos..." and "Little digital products that pay you 24/7."

34.     The emails also reiterate the same points made in Growth Cave Defendants' video advertisements, particularly that KBA is an exclusive opportunity to partner with Growth Cave Defendants and quickly set up and sell an

online course generating thousands of dollars of passive income on a monthly basis. For example, one email reads:

> I'm looking for 3 motivated people to take under my wing and teach them our process for launching their own online course to make 20k-50k/month passively. . . .
>
> If you decide to work [with] me & my team, we'll help you...
>
>> Package your knowledge into an online course that's ready to SELL in just 2-4 weeks. . . .
>>
>> Help you attract all the WARM leads & customers you could ever need using a simple 3-minute YouTube video ad.
>>
>> And more.
>
> We'll walk you through our exact process A-Z of helping you make that kind of income passively, with your very own online course.

35.     Prospective purchasers intrigued and excited by the representations in Growth Cave Defendants' advertisements are prompted to schedule a "1-on-1 strategy call" with a Growth Cave employee. Supposedly this is for the purpose of "vetting" the prospective purchaser so that Growth Cave Defendants are sure "we can 100% help you and we'll invite you to work with us one-on-one, building out your very first digital product together and working with you until you've made a minimum of $10,000."

36.     However, before attending the strategy call, Growth Cave Defendants require prospective purchasers to watch another video, narrated by Lee-Tyson and Batte, which provides additional detail on what Growth Cave Defendants provide

14

to KBA purchasers.

37.     In the video, Lee-Tyson and Batte represent that the average KBA purchaser profits within 4–6 weeks, as shown by the following exemplary screenshot:



38.     Just like all the prior advertisements, this video also features extravagant claims about the amount of money KBA purchasers have made or are likely to make, such as:

- "Upwards of $20- to $50,000 in monthly passive income with automated online courses."

- "we've showed you examples -- and you're going to see many more -- of clients making millions and millions of dollars with our online courses, clients making job-replacing, life-changing amounts of income $10,000, $20,000, $50,000 a month."

- "Many of our students are already making upwards of $100,000 and even

millions of dollars a year."

39.    This video also reiterates Growth Cave Defendants' representations regarding the significant assistance Growth Cave provides to help purchasers set up and sell their online businesses, particularly through Growth Cave's "AI software"—which will "automate nearly 100 percent of the process"—and "one-on-one" help from experts. Examples include:

- "the massive results that our team has been able to deliver using these done-for-you templates, using our AI software, and the personalized one-on-one help."

- "our very own AI software, . . . GrowthBox.AI, an all-in-one software platform for selling digital products . . . on autopilot."

- "our Knowledge Business Accelerator Program that includes working with six specialized coaches on our team one-on-one, six full-time coaches helping you with quite literally everything inside of this business model, your course idea, your ads, your tech, your sales funnel."

- "they hold your hand and walk you through the process to -- to build up, scale, and have a successful launch."

- "if you're not very techie, you don't have to worry because tech settings and ads, you're working hand-to-hand with the coaches. So they set everything up and go from there."

40.    In particular, Growth Cave Defendants highlight that their YouTube marketing services will find customers willing to buy the KBA purchasers' online courses. As described by Lee-Tyson:

included in [KBA] is what we call our Done-for-You Youtube Ad Sniper Targeting, where the advertising experts [at Growth Cave] will literally put your ad and course only in front of the hottest ready-to-buy

16

prospects in your market to virtually guarantee results for you. . . . [Y]ou know how much value there is in being able to . . . put your advertisement, put your product in front of the right potential customers, that's really 80, 90 percent of the battle. So this is something that we literally do for you to make sure that we are virtually guaranteeing results right out of the gate.

41.    In the video, Lee-Tyson and Batte state that KBA is "backed up" by their "$10,000 Profit Guarantee" and that they "mak[e] sure every single one of our clients hits that $10,000 profit guarantee." Lee-Tyson expressly represents that "there has not been a single person that, after launching their course, they have not made a minimum of $10,000 profit in their first 30 days of launching it."

42.    Once a prospective purchaser views the required video, they attend their "strategy" Zoom meeting, where a Growth Cave sales representative reiterates that Growth Cave Defendants will work closely with the KBA purchaser and provide comprehensive assistance to create a course and sell it to third parties through YouTube, generating passive income.

43.    Growth Cave Defendants' sales representatives emphasize the $10,000 profit guarantee to overcome any uncertainty prospective purchasers have about spending thousands to buy KBA. For instance, in a recorded call, Growth Cave Defendants' sales representative referenced the profit guarantee more than 30 times, repeatedly referring to the guarantee as a "safety net." He explained that Growth Cave is "comfortable enough to give that guarantee" because Growth Cave will "hold your hand and walk you through the process to [ ] build up, scale, and have a successful launch." He described how prospective purchasers "don't have to hesitate" because the guarantee is for $10,000 profit on top of the $9,800 price, so "you'll be recouped to $19,800." Many purchasers report that they bought KBA

because Growth Cave's advertisements and sales representatives led them to believe that the $10,000 profit guarantee meant they were guaranteed to quickly recoup their investment.

44.    During the "strategy call," after highlighting the $10,000 profit guarantee, Growth Cave discloses for the first time KBA's price, which ranges from $3,500 up to $9,800. If the prospective purchaser agrees to join the KBA business opportunity, the Growth Cave representative collects payment or helps sign up the KBA purchaser for financing during the very same call.

45.    In most instances, Growth Cave Defendants do not provide a copy of the Growth Cave Client Agreement until after the consumer has submitted payment. The Agreement is emailed to purchasers for electronic signature, via DocuSign, without an opportunity to negotiate any terms of the Agreement. The Agreement affirms Growth Cave's promise to provide KBA purchasers with "Automated Customer Acquisition," as well as a "Scale-Ready Offer," "Personal Consulting/Coaching From Lucas Lee-Tyson and team at Growth Cave," and other benefits.

46.    In numerous instances, consumers purchased KBA because they were persuaded by the representations Growth Cave Defendants make in their advertisements, emails, videos, and sales calls that setting up their online educational course will be very easy and will only take a short time, about 4–6 weeks, before they will begin to make substantial profits. Based upon Growth Cave Defendants' representations, consumers believe that Growth Cave will hold their hand through the whole process of creating and selling an online course and that there is no risk because they are guaranteed to earn at least $10,000 profit, which covers the cost of KBA.

47.    Growth Cave Defendants' representations also convince prospective purchasers that Growth Cave Defendants will provide, or assist with providing,

18

outlets or customers for the KBA purchaser's online course.

48.     Purchasers of the KBA business opportunity find that, due to Growth
Cave Defendants' undisclosed requirements, lengthy delays, and virtually non-
existent support, launching a profitable business with KBA is nowhere near as fast
and simple as advertised.

49.     Growth Cave's KBA business opportunity consists of multiple
different "modules" that must be completed to progress through the program. Each
module consists of watching training videos and completing other tasks, like
developing a course idea and drafting advertisements. KBA purchasers report that
completing the modules was confusing and could not be completed within a few
days or weeks.

50.     Growth Cave Defendants do not provide KBA purchasers with the
promised level of one-on-one assistance with creating a course. For example,
Growth Cave provided template scripts to use for advertisement videos, but KBA
purchasers had to spend significant time revising those scripts on their own
because they were not personalized.

51.     In many instances, Growth Cave coaches take days to respond to
questions, preventing KBA purchasers from making any progress in the meantime.
KBA purchasers are frequently assigned to new coaches, sometimes going through
five or more. Each time a new coach is assigned, the KBA purchaser must spend
time bringing their new coach up to speed on their course and how far along they
are in the program, which further delays progress.

52.     Additionally, Growth Cave's "AI software," GrowthBox, does not
"automate nearly 100% of the process" of setting up and operating an online
course, as promised. To the contrary, GrowthBox serves as a platform that requires
users to manually upload their advertisements, set appointments, and input
messages that can be sent out to potential customers via text message and email.

53.     At various stages, KBA purchasers must receive Growth Cave's approval to move forward. Growth Cave suggests that it must approve certain aspects of a KBA purchaser's online course to ensure its success with attracting customers. For example, Growth Cave requires KBA purchasers to test different versions of their advertisements and those advertisements must hit certain metrics demonstrating that they are attracting interested viewers before Growth Cave will allow the KBA purchaser to officially "launch" and begin selling their course to the public.

54.     However, after KBA purchasers spend months jumping through Growth Cave's hoops and finally get approval to launch their course, it becomes apparent that Growth Cave's requirements do not lead to success. In numerous instances, even if an advertisement hit the required metrics in the testing stage, the "winning" advertisement failed to attract purchasers. Many KBA purchasers told Growth Cave Defendants that their "winning" ads were not successfully generating traffic after their courses launched and asked how to improve their advertisements to attract purchasers, but Growth Cave's "experts" were generally unable to help KBA purchasers make any changes that attracted customers. Instead, the supposed "experts" frequently instructed KBA purchasers to attract customers by claiming they would make a lot of money using the course. Growth Cave did not take any steps to put KBA purchasers' courses in front of "ready-to-buy" customers as Growth Cave Defendants had promised.

55.     Although many consumers are lured into purchasing KBA based upon Growth Cave Defendants' promises to help "every step of the way" in setting up an educational course, purchasers later realize that Growth Cave Defendants do not provide the promised level of support and therefore purchasers are not able to launch their program quickly, if at all, and earn the promised income or profits.

### *KBA's Upsell Service: DFM*

56.     Capitalizing on the frustration and desperation felt by many KBA purchasers who were not receiving the promised assistance or earnings, in approximately December 2022, Growth Cave Defendants began sending KBA purchasers advertisements for DFM, an add-on service wherein Growth Cave would handle almost all aspects of operating the KBA purchaser's online course.

57.     DFM advertisements were appealing to KBA purchasers because they claimed that practically every aspect of setting up and selling a course would be "done for you." The advertisements also promised that DFM purchasers will receive personalized guidance, including guidance from Individual Defendants, which the KBA program lacked. For example, email advertisements from Lee-Tyson promise DFM consists of "a small group to work 1-on-1 with me personally."

58.     Growth Cave Defendants' advertisements implied that the DFM service would be highly selective, requiring KBA participants to apply and be selected for one of 25 available slots. These representations reinforced the KBA purchasers' belief that if they paid for the additional DFM service they would finally receive in-depth, one-on-one assistance and that Growth Cave Defendants would do all the work to create and sell their course.

59.     Hundreds of KBA purchasers agreed to pay an additional $30,000 to $50,000 for the DFM service (on top of their previous payment for the KBA program), based upon Growth Cave Defendants' representations that with the DFM service, they only needed to provide their course idea to Growth Cave, then Growth Cave would do all the work to create and sell their course, including scripting and filming advertisements, testing the advertisements, launching the course, and continuing to optimize the ads to ensure they were reaching interested buyers.

60.     Growth Cave's DFM Client Agreement confirms that DFM purchasers will receive 1-on-1 calls with Lee-Tyson, Batte, and Marksberry, who would provide specialized advice, as well as access to Growth Cave's "entire Done-For-You services department."

61.     At least one prospective purchaser asked Growth Cave Defendants if he could speak with a past DFM purchaser for a reference and Growth Cave told him to speak to Andrew Imbesi, who provided a glowing review of the DFM service. Neither Imbesi nor Growth Cave disclosed to this consumer that Imbesi had a pre-existing business relationship with Growth Cave to offer financing to new Growth Cave customers. Multiple Growth Cave advertisements also feature Imbesi as a successful and profitable Growth Cave client, without disclosing Imbesi's unique partnership with Growth Cave.

62.     Contrary to the Growth Cave Defendants' representations, DFM does not provide the services Growth Cave Defendants promised.

63.     Growth Cave Defendants do not provide DFM purchasers the promised "done-for-you" services. DFM purchasers report that Growth Cave Defendants did very little to help launch their course and the services they did provide were so subpar that the DFM purchasers had to spend significant time making corrections and improvements. For example, instead of developing and filming advertisements for the DFM purchasers, Growth Cave Defendants generally provided boilerplate templates and scripts, which required significant revisions. The DFM purchasers had to film their own advertisements, despite Growth Cave Defendants promising they would do so. Growth Cave Defendants did not target or run advertisements for DFM purchasers. Instead, the DFM purchasers had to set up and run their own advertisements, sometimes spending thousands to run their advertisements without success.

64.     Growth Cave Defendants did not provide specialized guidance to

DFM purchasers. Despite promising "1-on-1" meetings with Lee-Tyson, Batte, and Marksberry, on many occasions Lee-Tyson, Batte, and Marksberry were late or did not show up to their scheduled meetings with DFM purchasers. Moreover, Growth Cave's "experts" and coaches remained slow to respond to any questions and still could not offer any useful help to set up and sell a course, just like the KBA purchasers experienced before they paid for DFM.

65.    In April 2023, Growth Cave Defendants hosted an event in Austin, Texas for DFM purchasers, at which time numerous attendees announced to the Individual Defendants, in front of the other DFM attendees, they were not getting the support from Growth Cave to launch their course that Growth Cave Defendants had promised or, if they had launched their course, that they were not making sales or earning any income. Attendees at the event were surprised to see approximately 100 DFM purchasers in attendance, considering Growth Cave Defendants had claimed that DFM was an exclusive offering, with only 25 openings.

66.    In sum, the KBA purchasers who paid for additional DFM services did not receive any done-for-you services or specialized guidance that brought them any closer to selling an online course.

### Many KBA and DFM Purchasers Cannot Launch a Course Quickly and Never Profit

67.    Contrary to the repeated representations in Growth Cave Defendants' advertisements and from their sales representatives, many KBA purchasers, including those who purchased the DFM "done-for-you" service, are not able to launch a course and therefore do not earn any income or profits. KBA and DFM purchasers are unable to launch due to Growth Cave Defendants' failure to provide the promised services and support.

68.    Even those purchasers that do launch courses often cannot do so in the

short time-frame Growth Cave Defendants promised; multiple purchasers report that it took at least two months or more before they were approved to launch. Purchasers who launched their course—including multiple purchasers who launched for 30 days or more—were unable to make *any* profit, let alone hit Growth Cave Defendants' $10,000 profit guarantee. Growth Cave Defendants' "proven" YouTube marketing tactics are, in fact, unable to attract customers.

69.    In most instances, KBA purchasers do not make a single sale and therefore do not earn any income. Instead, they find themselves owing thousands of dollars to Growth Cave Defendants, credit card companies, or third-party lenders.

70.    Growth Cave Defendants are aware that KBA purchasers, including those who paid for DFM, did not receive the promised support and were unable to earn any income or profit from an online course because hundreds of KBA purchasers have complained through a wide variety of channels, including but not limited to the BBB, the FTC, state law enforcement agencies, social media platforms like Facebook, and directly to the Growth Cave Defendants.

71.    When KBA purchasers submitted complaints directly to Growth Cave through the company's internal message boards and messaging platforms, many noticed that Growth Cave Defendants routinely deleted the complaints and any other "negative" posts from the message boards.

72.    Dozens of KBA purchasers have submitted public complaints regarding Growth Cave to the BBB website, and Marksberry (and, in a few instances, Lee-Tyson) responded to those complaints but denied any wrongdoing. The BBB has included an alert on Growth Cave's BBB business profile page regarding a "pattern of complaint [sic] alleging Refund or Exchange Issues." The BBB alert read:

[C]onsumers are stating they sign up for programs guaranteed to help them make $10,000.00 in 30 days. Other consumers are also told they would receive coaching along the way, which many state they do not receive.

73.     Despite these complaints, Growth Cave Defendants have not changed their claims to match what they actually provide. For example, in numerous instances, KBA purchasers seek refunds based on Growth Cave Defendants' failure to meet their $10,000 profit guarantee. Growth Cave Defendants deny the refund requests and simply respond that the guarantee is only that Growth Cave will continue to "work with you" until you make $10,000—a caveat that Growth Cave Defendants only disclose through a provision slipped into the Agreement purchasers sign after paying for KBA. KBA purchasers are dismayed to realize that this "guarantee" is meaningless because they could continue to work with Growth Cave indefinitely without ever earning a dime.

**Growth Cave Defendants' Telemarketing and Texting Business Opportunity: CCA**

74.     In addition to the KBA business opportunity, Growth Cave offers a second business opportunity, CCA. Growth Cave Defendants claim that CCA purchasers will learn to call and text prospective customers to close new sales and guarantee that either Growth Cave Defendants or their "wealthy business owner" clients will pay the CCA purchaser for their "unique" sales skills.

75.     Like with KBA, prospective purchasers often learn about the CCA opportunity through videos posted by Growth Cave Defendants on YouTube, Facebook, and other sites. Those who click on a link beneath these videos will have the option to provide their email address to get more information about the CCA.

76.     Thereafter, Growth Cave Defendants send emails with subject lines framing the CCA as a money-making business opportunity, such as: "Get $750/week to read 'money' scripts," "$800 a week to send texts," and "Work from phone. $3,000/month."

77.     The emails expressly state that Lee-Tyson or one of his contacts will pay CCA purchasers hundreds of dollars per week to send texts or make phone calls and that they can get started right away. For example, Lee-Tyson sent emails to prospective purchasers stating as follows:

- "A certain business told me that they're looking to pay 20 people $800-$1,200/week to read simple scripts into their phones… All you need is a phone, and an internet connection, and you can get started today."

- "Right now, you can start making upwards of $7.5k/month just by talking and texting on your phone."

- "[I]f you read scripts into your phone for 1 hour a day I will pay you $500/week."

- "[M]any business owners will pay you over $800/week to take calls and send texts for just an hour a day."

- "All I need you to do is, answer a few phone calls, and send a few texts… Then I'll pay you $800/week for your efforts."

- "If you can spend an hour a day talking into your phone, I'll personally pay you $3,200 - $3,500 a month."

78.     Prospective CCA purchasers are prompted to schedule a meeting with a Growth Cave representative. However, before attending that meeting, the prospective purchasers are required to watch a video, wherein Lee-Tyson and Batte discuss the CCA program in detail. A screenshot of this video narrated by Lee-Tyson and Batte is shown below:



79. In the video, Lee-Tyson and Batte make additional representations regarding the income prospective purchasers can expect to make through the CCA business opportunity. Examples include:

- "you could actually make $20-, $30-, $40,000 a month."
- "you could easily make from $2,800 to $5,000 a month . . . just copy and pasting and texting."
- "even in a worst-case scenario, making $4-, $5-, $6-, $7,000 a month, just typing messages in your phone."
- "We have guys that are doing this that are making upwards of $20-, $30-, $40,000."

80. Lee-Tyson and Batte advise that on average it takes 30 days to "get certified and graduate" from the CCA, but that two weeks "is really the norm."

81. Lee-Tyson and Batte insist that the skills taught in the CCA are "worth a lot" and that they have a "community of over 1,000 business owners" that

are "all in desperate need of cash flow consultants" and that "many" of these business owners are "making $10,000 a month to all the way at the high end making multi-millions of dollars every single year." These representations lead prospective purchasers to believe that if they buy the CCA opportunity, there will be a large pool of wealthy business owners who will be ready and willing to pay for their CCA services.

82.    By guaranteeing CCA purchasers a "placement" with Growth Cave or one of its clients, Growth Cave Defendants promise to provide CCA purchasers with customers or outlets willing to pay for the services of CCA graduates. Growth Cave Defendants specifically promise to provide a placement within "a short period" after graduating from the CCA. Batte confirms in a video advertisement that this guaranteed placement is for pay, stating: "we guarantee that once you get here, either you work with us or you work with one of our clients. . . So [ ] the pay is going to be amazing."

83.    Lee-Tyson and Batte provide misleading hypotheticals using "conservative" numbers to convey how easily CCA graduates will be able to earn profits once they are placed with a company. For example, Lee-Tyson and Batte walk through a hypothetical based upon texting 50 prospects per day and only needing to convince three of those prospects to make a purchase to earn a commission of $375 per day.

84.    To reinforce their hypothetical scenarios, Lee-Tyson and Batte share four testimonials from unnamed "clients" who achieved "incredible results," such as "$23,000 in one month;" "$32,000;" and $10,000 within the first 30 days. All four of these "clients" are in fact Growth Cave employees—Jose Fang, Nour Bouhamdan, Donnie Crawford, and Matthew Pulliam—who sell Growth Cave's programs. At no point do Lee-Tyson or Batte disclose that the individuals providing these testimonials are Growth Cave employees or state the percentage of

CCA purchasers who achieve the stated income level. To the contrary, Lee-Tyson and Batte subsequently engage in further discussion of how Matt—an attorney— and Donnie—a real estate agent—are making more money through the CCA than they ever did in their prior careers, again without disclosing that Matt and Donnie are Growth Cave employees. Moreover, although Growth Cave Defendants' CCA advertisements mention the possibility of being hired by Growth Cave upon graduation, out of the hundreds—if not thousands—of CCA purchasers, it appears that the four individuals providing testimonials are the only CCA graduates that Growth Cave ever hired. Growth Cave Defendants have misrepresented, both expressly and by implication, that these four individuals' experiences represent what prospective purchasers can expect to achieve through the CCA program.

85.    Prospective purchasers now proceed to a Zoom meeting with a Growth Cave employee who reiterates that Growth Cave Defendants guarantee they will provide CCA graduates with outlets, accounts, or customers for their CCA services, which will lead to high earnings. At this time, Growth Cave reveals that there is a fee to join the CCA, which ranges from $4,800 to $6,800. Based upon Growth Cave Defendants' representations that they have a network of more than 1,000 business owners in need of CCA services, that they "guarantee" CCA graduates will be placed with a business owner, and "even in a worst-case scenario," the CCA purchaser will be earning "$4-, $5-, $6-, $7,000 a month," many prospective purchasers believe the CCA opportunity is an easy, safe way to earn income and agree to purchase the CCA opportunity.

86.    CCA purchasers are required to sign a CCA Client Agreement, which confirms Growth Cave Defendants' earlier promises that CCA purchasers will receive "placement with 1 of our business owner clients upon graduating from the academy." Growth Cave Defendants' promise to provide a "placement" that will pay CCA purchasers for their services constitutes a representation that Growth

Cave Defendants will provide outlets, accounts, or customers to purchasers of the CCA business opportunity.

87.    In fact, the CCA is nothing like Growth Cave Defendants advertised. In numerous instances, purchasers are unable to complete the CCA training within two weeks or even 30 days. CCA purchasers discover that to proceed through the CCA, they must watch training videos and then take a quiz. Growth Cave requires a 100% score on every quiz, but ordinarily will not disclose what answers are incorrect, so CCA purchasers often take the same quiz over and over before scoring 100%.

### *CCA Purchasers Cannot "Graduate" Quickly and Do Not Receive a Paid Placement*

88.    Despite Growth Cave Defendants' promises, in numerous instances, Growth Cave did not provide CCA graduates a "placement" to work for Growth Cave or one of Growth Cave's clients. In some instances, Growth Cave Defendants did not even attempt to provide CCA graduates with a placement and instead Growth Cave employees instructed CCA graduates to "network" on Facebook to find paying customers on their own, which garnered more interest from other scammers than legitimate businesses. Even if a CCA graduate did find a legitimate opening through Facebook or other channels, they did not have the requisite training or experience to obtain work, because the "skill set" taught through the CCA was only marketable to Growth Cave and Growth Cave's "clients." As a result of Growth Cave Defendants' failure to provide CCA purchasers with the promised placement with a business owner, CCA purchasers were unable to earn any income.

89.    Very rarely, Growth Cave Defendants posted on Growth Cave's internal messaging platforms about businesses in need of CCA services. However,

CCA purchasers observed that those openings were very competitive and were filled almost immediately. Growth Cave Defendants' advertisements made it sound as if they would simply match CCA graduates with one of their many clients requiring CCA services and did not mention anything about CCA graduates needing to apply or compete for the customers, so CCA purchasers were surprised and upset that it was so difficult to get placed with a company. Some CCA purchasers have stated that they never would have paid for the CCA opportunity if they knew how difficult it would be to get a placement and earn an income.

90.    In the occasional instance when Growth Cave did place CCA graduates with one of Growth Cave's clients, it turned out that the clients were not "wealthy business owners" earning millions of dollars a year—as Lee-Tyson claimed—they were KBA purchasers who were typically struggling to generate any sales and certainly did not have 50+ interested prospective customers for a CCA graduate to contact on a daily basis, as Lee-Tyson and Batte suggested in their "hypotheticals." Thus, despite receiving a placement, these CCA graduates were unable to generate any sales for the floundering businesses and therefore did not earn any income.

91.    In numerous instances, despite Growth Cave Defendants' promises, CCA purchasers did not receive a placement with a business shortly after graduation, if ever, and did not make any income or profits, let alone thousands of dollars a month.

92.    Many CCA purchasers contacted Growth Cave Defendants to express their disappointment that Growth Cave Defendants had not placed them with a business in need of their CCA services and, as a result, they had not earned any money through the CCA opportunity. Growth Cave Defendants frequently ignored these complaints or denied wrongdoing, sometimes shifting blame onto the CCA purchaser. When CCA purchasers requested refunds due to Growth Cave

Defendants' failure to fulfill its promises, Growth Cave Defendants almost always denied the refund request.

### Growth Cave Failed to Provide Required Disclosures and Earnings Claim Statements

93.    Growth Cave makes repeated income claims regarding its KBA and CCA business opportunities through the general media, including but not limited to the income claims made in marketing emails and in videos posted to Growth Cave's website, YouTube, and social media platforms. Growth Cave failed to state in immediate conjunction with the income claims made in the general media: (i) the beginning and ending dates when the represented earnings were achieved and (ii) the number and percentage of all persons who purchased the business opportunity prior to that ending date who achieved at least the stated level of earnings, as required by the Business Opportunity Rule.

94.    Growth Cave did not provide prospective purchasers with disclosure documents required under the Rule. Growth Cave does not provide prospective purchasers with a written document containing material information, such as a list of lawsuits filed against Growth Cave Defendants or contact information for individuals who purchased the KBA or CCA business opportunities within the last three years.

95.    Although Growth Cave routinely makes claims to prospective purchasers about likely earnings, it fails to provide prospective purchasers with an Earnings Claim Statement required by the Rule. Growth Cave also fails to have a reasonable basis for or written substantiation of the income claims it makes to prospective purchasers of the KBA and CCA business opportunities.

96.    In fact, as Growth Cave does not track the finances of those who purchase its business opportunities, Growth Cave does not have a reasonable basis

for or written substantiation of its earnings claims.

### Buffalo Bridge Credit Repair Services

97.     In approximately November 2023, Batte and Lee-Tyson, on behalf of Growth Cave, began to email KBA and CCA purchasers regarding Growth Cave's new partnership with a company that would provide credit repair services and help procure up to $50,000 in 0% interest "institutional funding." Growth Cave Defendants' advertisements did not disclose that this "partnership" was between Growth Cave and Growth Cave's own d/b/a, Buffalo Bridge. Buffalo Bridge is not a separate corporate entity; it is just another Growth Cave program.

98.     Consumers who requested more information on this credit repair and business funding offer were scheduled for informational Zoom meetings with Growth Cave employees, including Nour Bouhamdan and Matthew Pulliam. Growth Cave promised to help improve the consumer's credit score, so that the consumer could obtain funding to support their KBA or CCA business, and to provide credit repair, including by removing from the consumer's credit report any negative information and any inquiries related to obtaining funding. Growth Cave made these promises even though there is no legal way to remove accurate, non-obsolete negative items from a consumer's credit history. Growth Cave charged $6,800 for the Buffalo Bridge program and required an up-front payment before Growth Cave provided the purchaser with any credit repair or other services.

99.     Purchasers of Growth Cave's Buffalo Bridge program were subsequently required to sign the Buffalo Bridge Capital Client Agreement, which confirms that enrollees will receive "assisted credit repair," and "business entity & credit funding advising," among other services.

100.   The Buffalo Bridge Client Agreement does not contain the amount of the payment to be made by the consumer for the Buffalo Bridge program; an estimate of the date on which the credit repair services are expected to be

completed or the period of time Growth Cave will need to provide the promised credit repair services; or the principal business address of Growth Cave d/b/a Buffalo Bridge. The Agreement also does not contain a conspicuous statement in bold face type, located in immediate proximity to the consumer's signature line, advising the consumer of their right to cancel without penalty or obligation at any time before midnight on the third business day after signing. The Agreement does not enclose a Notice of Cancellation stating the consumer's cancellation rights.

101.    Growth Cave did not provide consumers with a written statement concerning "Consumer Credit File Rights Under State and Federal Law" before or after requiring consumers to sign the Buffalo Bridge Client Agreement.

102.    After paying for the Buffalo Bridge service, purchasers learn they are required to complete various tasks that Growth Cave did not disclose previously. For example, Buffalo Bridge purchasers are instructed to pay to register their KBA or CCA business as an LLC, which can cost hundreds of dollars.

103.    Buffalo Bridge members were also instructed to sign up and pay monthly fees for additional credit monitoring services, such as "OrcaBoost." Consumers were told that they would need to improve their credit score before moving forward with funding and "to achieve this, you will be working with OrcaBoost, a company that we have partnered with that will assist you to get any negative items on your report removed." In fact, OrcaBoost is just another LLC created and managed by Lee-Tyson and Batte. Growth Cave Defendants do not disclose this to consumers.

104.    Buffalo Bridge's method of obtaining 0% interest business funding consists entirely of instructing participants to apply for multiple business credit cards with 0% interest introductory rates. The Buffalo Bridge program does not obtain singular business loans of $50,000 with 0% interest, despite the representations in its advertisements. In numerous instances, Growth Cave

Defendants did not improve Buffalo Bridge purchasers' credit scores or eliminate negative items from their credit history, as promised.

## DEFENDANTS' NEW BUSINESS ACTIVITIES

105.    Beginning in approximately March 2024, several consumers began filing suit in federal courts against Growth Cave Defendants.

106.    In the wake of these lawsuits, Growth Cave Defendants did not cease their deceptive business practices. However, around the end of May 2024, Lee-Tyson and Batte began sending marketing emails offering Growth Cave's programs at a steeply discounted rate. By early June 2024, Lee-Tyson's emails began to mention a "re-brand."

107.    In addition to continuing to operate KBA, DFM, and CCA, Individual Defendants have begun marketing new, similar business opportunities.

## PassiveApps

108.    Lee-Tyson, seemingly still operating under Growth Cave, has begun advertising a business opportunity called PassiveApps. Lee-Tyson's PassiveApps marketing emails reference many of the same selling points used for KBA and DFM, except now Lee-Tyson claims he will show purchasers how to make massive profits selling digital applications through Apple's App Store, rather than by selling educational courses through YouTube. For example, one of Lee-Tyson's PassiveApps emails boasts "I've been making over $15,000/month from phone apps." Another PassiveApps email inquires: "Want to make a few hundred dollars a week from Apple, and working only part time? → Click here to learn more."

109.    Clicking the link within these emails leads to a PassiveApps video advertisement narrated by Lee-Tyson, where he uses many similar claims that were used to advertise KBA. For example, Lee-Tyson claims that purchasers of the PassiveApps opportunity can use his proprietary AI system, PassiveApps.ai, and

"unlimited support" from his team to launch an app within 14 days and "start profiting." Lee-Tyson is charging $1,999, or four payments of $699, for the PassiveApps opportunity. Lee-Tyson also offers an add-on service costing approximately $10,000, where Lee-Tyson promises to "launch your first app for you"—a clear corollary to the DFM service offered to KBA purchasers. Exemplary screenshots from Lee-Tyson's PassiveApps video are shown below:





110.    Growth Cave and Lee-Tyson represent that they will provide or assist

with providing outlets or customers to purchasers of the PassiveApps opportunity. In the PassiveApps video, Lee-Tyson emphasizes PassiveApps' "quality control service," whereby his "team of experts will review and approve your app before it goes live." Lee-Tyson explains that many prospective purchasers want their app reviewed before they launch to "make sure that it's actually going to make them money," which is why his "quality control" team will "personally review and approve" each app so that purchasers are "100% confident" their app is "ready to go to maximize profits." Lee-Tyson also claims that PassiveApps purchasers can get paid to create apps for third parties and that he will provide a "list of creators who're hiring right NOW." Through these claims, Growth Cave and Lee-Tyson represent that they will provide PassiveApps purchasers with outlets, accounts, or customers for their apps, leading to profits.

111.    In the PassiveApps video, Lee-Tyson plays testimonial videos from individuals who supposedly "sat through this web class, have enrolled into the PassiveApps program, and now have sent in videos for me to share with prospective students." However, the testimonial videos are the very same testimonials shown in Growth Cave's KBA advertisements, including videos from "Willie," who collected over $65,928 within a week of launching, and Andrew Imbesi, who earned $56,000 in one month. The individuals in the testimonial videos are describing their experiences and alleged earnings in the KBA opportunity, *not* PassiveApps.

112.    Additionally, despite making earnings claims in the general media, including through mass emails and videos posted online, Lee-Tyson and Growth Cave do not provide disclosures required by the Business Opportunity Rule, such as the beginning and ending dates when the represented earnings were achieved or the number and percentage of all PassiveApps purchasers who achieved the stated level of earnings.

**Apex Mind**

113.   Batte formed a limited liability company, Apex Mind, in Colorado on April 9, 2024. Apex Mind's website shows that many Growth Cave employees and officers are now affiliated with Apex Mind, including but not limited to Individual Defendant Marksberry, Matthew Pulliam, and Donnie Crawford.

114.   Apex Mind's marketing indicates that Apex Mind is merely a continuation of Growth Cave's CCA business opportunity, wherein consumers are induced to pay for the opportunity to work for "business owners" within Apex Mind's "network." Batte frequently sends mass emails marketing Apex Mind, including to purchasers of Growth Cave business opportunities. These emails contain many of the same key phrases that Batte used to market the CCA opportunity, such as his ability to "show you a high demand skillset you can learn to get paid" and that these are "unique skills" that "business owners want to pay you for." Batte's emails also emphasize the likelihood of earning significant income with Apex Mind, for example:

- An email with the subject "DIRECT DEPOSIT: $4,500" reads: "$4,500 hits your account... You've been working for 2 weeks at a new job, and just received your first paycheck. . . . I want to show you how *you can do it too.*"

- An email with the subject line "investment that pays a doctors salary" states: "[M]astering this one high-paying skill is how I've been making more than doctors while working from home. And you could do the same to start getting paid 100% remotely. > Just click here and I'll show you how."

- An email with the subject line "still want to work from home?" claims: "You could replace your income . . . . I have a network of 28

business owners that are looking to remotely hire . . . . > Click here and I'll show you how you can apply."

115.   Prospective purchasers who click the link in Batte's emails are shown Apex Mind marketing videos, narrated by Batte and other Apex Mind employees, including Marksberry. The various Apex Mind videos reiterate the same selling points used for the CCA opportunity, emphasizing that Apex Mind provides purchasers with "skills that wealthy business owners are going to pay you top-dollar for because you're going to bring new customers to their business." Batte also highlights the potential for profits, bragging that the people he trained in the past are now making "$5,000, $10,000, $20,000 a month."

116.   When making income claims in the general media, including via commercial bulk email and in videos posted to the Internet, Apex Mind does not state in immediate conjunction with the income claim (i) the beginning and ending dates when the represented earnings were achieved and (ii) the number and percentage of all persons who purchased the business opportunity prior to that ending date who achieved at least the stated level of earnings, as required by the Business Opportunity Rule.

117.   The Apex Mind videos replay the same four testimonials that were provided by Growth Cave employees in the CCA video—now touting them as examples of "clients" who earned "$23,000," "$32,000," and "$10,000" using the "skillset" Batte teaches at Apex Mind. Batte and Marksberry do not disclose that all four testimonials were provided by individuals employed by Growth Cave and/or Apex Mind.

118.   After viewing Apex Mind's marketing videos, prospective purchasers can schedule a Zoom meeting with Apex Mind. In a recorded call, an Apex Mind representative, Donnie Crawford, described the Apex Mind business opportunity in

greater detail, explaining that purchasers are trained to "speak and text with potential clients." Supposedly, these skills will make Apex Mind purchasers indispensable to business owners who need help closing sales with potential clients.

119.    Next, Crawford stated that Apex Mind assigns purchasers to three coaches, including a "placement coach" who ensures "we find you the perfect [ ] position." Apex Mind allegedly has a "business acquisition team," which acquires businesses and conducts a "vetting process" of the businesses so that Apex Mind knows "how many clients are being successful with that company." In the event a purchaser is dissatisfied with the company they are assigned to work with, Apex Mind will "get a new placement." Just like with CCA, the promise that Apex Mind has an existing "network" of "business owners" and will place the purchaser with a business that will pay the purchaser for their services—the "unique skills" taught by Apex Mind—constitutes a representation that Apex Mind will provide outlets, accounts, or customers for the services of purchasers of the Apex Mind opportunity.

120.    Apex Mind is charging $4,850 for this business opportunity. Apex Mind's representative requested immediate payment during the recorded call and offered to arrange third-party financing if necessary.

121.    When asked about the average amount of income earned through the Apex Mind opportunity and how long it takes to begin earning income, Apex Mind's representative refused to provide specifics and claimed "there really is no average." Instead, he provided an example of a successful client who finished the Apex Mind training within a week, had a placement lined up for the next week, and earned $4,000 in his first week in his placement.

122.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws

enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

123.   Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

124.   Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

125.   As set forth below, Defendants have engaged and continue to engage in violations of Section 5(a) of the FTC Act in connection with the advertising, marketing, and sale of their business opportunities and related programs.

## COUNT ONE

### False or Unsubstantiated Earnings Claims

### *(Against Defendants Growth Cave, Lee-Tyson, Batte, and Marksberry)*

126.   In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of Growth Cave business opportunities, Growth Cave Defendants have represented, directly or indirectly, expressly or by implication, that purchasers of Growth Cave business opportunities are likely to earn substantial income.

127.   The representations set forth in Paragraph 126 above are false, misleading, or were not substantiated at the time the representations were made.

128.   Therefore, Growth Cave Defendants' representations as set forth in Paragraph 126 constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT TWO

### Other Misrepresentations Regarding Growth Cave Business Opportunities

### *(Against Defendants Growth Cave, Lee-Tyson, Batte, and Marksberry)*

129.   In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of Growth Cave business opportunities,

41

Growth Cave Defendants represented, directly or indirectly, expressly or by implication, that:

        a.  purchasers of Growth Cave's digital education business opportunity will be able to launch their own course within 4-6 weeks and attract customers; and

        b.  purchasers of Growth Cave's CCA program will be able to complete the program and "graduate" within 30 days and receive a placement with a paying company soon after graduation.

130.   The representations set forth in Paragraph 129 above are false, misleading, or were not substantiated at the time the representations were made.

131.   Therefore, Growth Cave Defendants' representations as set forth in Paragraph 129 constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT THREE

### Failure to Disclose Material Connections

### *(Against All Defendants)*

132.   Through the means described in Paragraphs 31, 61, 84, 111, and 117, Defendants have represented, expressly or by implication, that certain testimonials and endorsements of Growth Cave and Apex Mind programs reflected the independent experiences or opinions of impartial, ordinary users of Growth Cave or Apex Mind.

133.   In fact, in numerous instances in which Defendants have made the representation set forth in Paragraph 132, Defendants have failed to disclose or disclose adequately that certain of the individuals providing testimonials and endorsements for Growth Cave and Apex Mind have a business or employment relationship with Growth Cave or Apex Mind. This fact would be material to consumers in evaluating the testimonials and endorsements of the Defendants'

business opportunities in connection with a purchase decision.

134.    Therefore, Defendants' failure to disclose or disclose adequately the material information described in Paragraph 133, in light of the representation in Paragraph 133, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT FOUR

### False or Misleading Consumer Testimonials

### *(Against Defendants Growth Cave and Lee-Tyson)*

135.    Through the means described in Paragraph 111, Growth Cave and Lee-Tyson have represented, expressly or by implication, that individuals providing testimonials in an advertisement for PassiveApps are describing their experiences with the PassiveApps business opportunity Growth Cave and Lee-Tyson are promoting in the advertisement.

136.    In numerous instances in which Growth Cave and Lee-Tyson have made the representation set forth in Paragraph 135, the individuals providing testimonials in advertisements are not describing their experiences with the PassiveApps program Growth Cave and Lee-Tyson are promoting in the advertisement.

137.    Therefore, the making of the representations set forth in Paragraph 135 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE BUSINESS OPPORTUNITY RULE

138.    The amended Business Opportunity Rule, 16 C.F.R. Part 437, which was extended in scope to cover certain work-at-home opportunities, became effective on March 1, 2012, and has since that date remained in full force and effect.

139.    Defendants are "sellers" who, as described in Paragraphs 2–6, 10–11,

15–96, and 105–123, have sold or offered to sell "business opportunities" as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(c) and (q). Under the Business Opportunity Rule, a "seller" is a person who offers for sale or sells a business opportunity. 16 C.F.R. § 437.1(q). Under the Rule, a "business opportunity" means a "commercial arrangement" in which a "seller solicits a prospective purchaser to enter into a new business;" the "prospective purchaser makes a required payment;" and the "seller, expressly or by implication, orally or in writing, represents that the seller or one or more designated persons will . . . [p]rovide outlets, accounts, or customers, including, but not limited to, Internet outlets, accounts, or customers, for the purchaser's goods or services[.]" 16 C.F.R. § 437.1(c).

140.   Among other things, the Business Opportunity Rule requires sellers to provide prospective purchasers with a disclosure document in the form and using the language set forth in the Business Opportunity Rule and its Appendix A, and any required attachments. In the disclosure document, the seller must disclose to prospective purchasers five categories of information, including: basic identifying information about the seller, any earnings claims the seller makes, the seller's litigation history, any cancellation and refund policy the seller offers, and contact information of prior purchasers. 16 C.F.R. § 437.3(a)(1)-(5). Furthermore, this information must be disclosed at least seven days before the prospective purchaser signs a contract or makes a payment. 16 C.F.R. § 437.2. The pre-sale disclosure of this information enables a prospective purchaser to contact prior purchasers and take other steps to assess the potential risks involved in the purchase of the business opportunity.

141.   Defendants, as described in Paragraphs 17–18, 27–35, 37–38, 41, 43–44, 46, 76–77, 79, 83–85, 108, 111, 114–115, 117, and 121, have made earnings claims in connection with the sale of their business opportunities. Under the

Business Opportunity Rule, an "earnings claim" means "any oral, written, or visual representation to a prospective purchaser that conveys, expressly or by implication, a specific level or range of actual potential sales, or gross or net income or profits." 16 C.F.R. § 437.1(f).

142.  The Business Opportunity Rule prohibits sellers from making earnings claims unless the seller: (1) has a reasonable basis for the claim at the time it is made; (2) has in its possession written materials to substantiate the claim at the time it is made; (3) makes written substantiation of the earnings claim available to any prospective purchaser upon request; and (4) furnishes an Earnings Claim statement to prospective purchasers in conjunction with the disclosure document, containing, among other things, information regarding the time frame captured by the earnings claim, the characteristics of the purchasers, and the number and percentage of all persons who purchased the business opportunity within the time frame who achieved at least the stated level of earnings. 16 C.F.R. § 437.4(a).

143.  Defendants, as described in Paragraphs 17–18, 28–35, 37–38, 41, 46, 76–77, 79, 83–84, 108, 111, 114–115, and 117, have also made earnings claims in connection with the sale of their business opportunities in the general media. Under the Business Opportunity Rule, "general media" means "any instrumentality through which a person may communicate with the public, including, but not limited to, television, radio, print, Internet, billboard, Web site, commercial bulk email, and mobile communications." 16 C.F.R. § 437.1(h).

144.  The Business Opportunity Rule prohibits sellers from making earnings claims in the general media unless the seller has a reasonable basis for and written substantiation of any earnings claims and states in immediate conjunction with those claims the beginning and ending dates when the represented earnings were achieved, and the number and percentage of all persons who

purchased Defendants' business opportunity prior to that ending date who achieved at least the stated level of earnings. 16 C.F.R. § 437.4(b).

145.   The Business Opportunity Rule also prohibits sellers from misrepresenting the amount of sales, or gross or net income or profits a prospective purchaser may earn or that prior purchasers have earned. 16 C.F.R. § 437.6(d).

146.   The Business Opportunity Rule also prohibits sellers from misrepresenting any material aspect of any assistance offered to a prospective purchaser. 16 C.F.R. § 437.6(i).

147.   Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Business Opportunity Rule constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT FIVE

### Pre-Sale Disclosure Violations

### *(Against Defendants Growth Cave, Lee-Tyson, Batte, and Marksberry)*

148.   In numerous instances in connection with the offer for sale, sale, or promotion of business opportunities, Growth Cave Defendants have failed to furnish prospective purchasers with a disclosure document and any required attachments within the time period prescribed by the Business Opportunity Rule.

149.   Therefore, Growth Cave Defendants' acts and practices, as described in Paragraph 148, violate the Business Opportunity Rule, 16 C.F.R. § 437.2, and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT SIX

### Disclosure Violations

### *(Against Defendants Growth Cave, Lee-Tyson, Batte, and Marksberry)*

150.   In numerous instances in connection with the offer for sale, sale, or promotion of business opportunities, Growth Cave Defendants have failed to

furnish prospective purchasers with a disclosure document and any required attachments.

151.    Therefore, Growth Cave Defendants' acts and practices, as described in Paragraph 150, violate the Business Opportunity Rule, 16 C.F.R. § 437.3(a), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT SEVEN

### Earnings Claims to Prospective Purchasers Violations
### *(Against Defendants Growth Cave, Lee-Tyson, Batte, and Marksberry)*

152.    In numerous instances, Growth Cave Defendants have made earnings claims to prospective purchasers in connection with the offering for sale, sale, or promotion of a business opportunity while, among other things: (1) lacking a reasonable basis for the earnings claim at the time it was made; (2) lacking written substantiation for the earnings claim at the time it was made; (3) refusing to make written substantiation available upon request to prospective purchasers, or (4) failing to provide an earnings claim statement to the prospective purchasers, as required by the Business Opportunity Rule.

153.    Therefore, Growth Cave Defendants' acts and practices, as described in Paragraph 152, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(a) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT EIGHT

### General Media Earnings Claims Violations
### *(Against All Defendants)*

154.    In numerous instances, Defendants have made earnings claims in the general media in connection with the offering for sale, sale, or promotion of a business opportunity while failing to state in immediate conjunction with those claims the beginning and ending dates when the represented earnings were achieved, and the number and percentage of all persons who purchased

47

Defendants' business opportunity prior to that ending date who achieved at least the stated level of earnings.

155.    Therefore, Defendants' acts and practices, as described in Paragraph 154, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(b) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT NINE

### Misrepresentations Regarding Income or Profits
### *(Against Defendants Growth Cave, Lee-Tyson, Batte, and Marksberry)*

156.    In numerous instances in connection with the offer for sale, sale, or promotion of business opportunities, Growth Cave Defendants have misrepresented the amount of sales, or gross or net income or profits, a prospective purchaser may earn or that prior purchasers have earned.

157.    Therefore, Growth Cave Defendants' acts and practices, as described in Paragraph 156, violate the Business Opportunity Rule, 16 C.F.R. § 437.6(d) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT TEN

### Misrepresentations Regarding Material Aspects of Assistance
### *(Against Defendants Growth Cave, Lee-Tyson, Batte, and Marksberry)*

158.    In numerous instances, Growth Cave Defendants have misrepresented material aspects of the assistance offered to prospective purchasers of Growth Cave business opportunities.

159.    Therefore, Growth Cave Defendants' acts and practices, as described in Paragraph 158, violate the Business Opportunity Rule, 16 C.F.R. § 437.6(i) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE CREDIT REPAIR ORGANIZATIONS ACT

160.    The Credit Repair Organizations Act took effect on April 1, 1997, and has since that date remained in full force and effect.

161.   The purposes of CROA, according to Congress, are (1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations. 15 U.S.C. § 1679(b).

162.   CROA defines a "credit repair organization" as "any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that they can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of (i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i) . . . ." 15 U.S.C. § 1679a(3)(A).

163.   Defendant Growth Cave d/b/a Buffalo Bridge is a credit repair organization.

164.   CROA prohibits all persons from making or using any untrue or misleading representation of the services of the credit repair organization. 15 U.S.C. § 1679b(a)(3).

165.   CROA prohibits credit repair organizations from charging or receiving any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed. 15 U.S.C. § 1679b(b).

166.   CROA requires credit repair organizations to provide consumers with a written statement containing prescribed language concerning "Consumer Credit File Rights Under State and Federal Law" before any contract or agreement is executed. 15 U.S.C. § 1679c(a).

167.   CROA requires credit repair organizations to include certain terms and conditions in any contract or agreement for services, including (1) the terms

and conditions of payment, including the total amount of all payments to be made by the consumer to the credit repair organization or to any other person; (2) a full and detailed description of the services to be performed by the credit repair organization for the consumer, including—(A) all guarantees of performance; and (B) an estimate of (i) the date by which the performance of the services (to be performed by the credit repair organization or any other person) will be complete; or (ii) the length of the period necessary to perform such services; and (3) the credit repair organization's name and principal business address. 15 U.S.C. § 1679d(b)(1)–(3). Such written contract must also include a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: "You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right." 15 U.S.C. § 1679d(b)(4).

168. CROA requires credit repair organizations to provide consumers with a "Notice of Cancellation" form, in duplicate, containing prescribed language concerning consumers' three-day right to cancel that consumers can use to cancel the contract. 15 U.S.C. § 1679e(b).

169. CROA requires that any consumer who enters into a contract with a credit repair organization shall be given a copy of the completed contract, the disclosure of Consumer Credit File Rights Under State and Federal Law required under the Act, and any other document the credit repair organization requires the consumer to sign. 15 U.S.C. § 1679e(c).

170. Pursuant to Section 410(b)(1) of CROA, 15 U.S.C. § 1679h(b)(1), any violation of any requirement or prohibition of CROA constitutes an unfair or deceptive act or practice in commerce in violation of Section 5(a) of the FTC Act,

15 US.C. § 45(a). Pursuant to Section 410(b)(2) of CROA, 15 U.S.C. § 1679h(b)(2), all functions and powers of the FTC under the FTC Act are available to the FTC to enforce compliance with CROA in the same manner as if the violation had been a violation of any FTC trade regulation rule. Section 19(a)(1) of the FTC Act, 15 U.S.C. § 57b(a)(1), provides that the FTC may commence a civil action against "any person, partnership, or corporation" who "violates any rule . . . respecting unfair or deceptive acts or practices."

## COUNT ELEVEN

### Misrepresentations Regarding Credit Repair Services

### *(Against Defendants Growth Cave, Lee-Tyson, Batte, and Marksberry)*

171.   In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of services to consumers by a credit repair organization, Growth Cave Defendants have made untrue or misleading representations to consumers, including that Growth Cave Defendants will improve consumers' credit scores or ratings, including by, among other things, removing negative information and hard inquiries from consumers' credit reports or profiles even where such information is accurate and not obsolete.

172.   Growth Cave Defendants' acts or practices, as described in Paragraph 172, violate CROA, 15 U.S.C. § 1679b(a)(3), and therefore are deceptive or unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT TWELVE

### Violation of Prohibition Against Charging Advance Fees for Credit Repair Services

### *(Against Defendants Growth Cave, Lee-Tyson, Batte, and Marksberry)*

173.   In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of services to consumers by a credit repair organization, Growth Cave Defendants have charged or received money or other

valuable consideration for the performance of credit repair services that Growth Cave Defendants have agreed to perform before such services were fully performed.

174.   Growth Cave Defendants' acts or practices, as described in Paragraph 173, violate CROA, 15 U.S.C. § 1679b(b), and therefore are deceptive or unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT THIRTEEN

**Failure to Provide Required Disclosures and Documents**

***(Against Defendants Growth Cave, Lee-Tyson, Batte, and Marksberry)***

175.   In numerous instances, in connection with the sale of services to consumers by a credit repair organization, Growth Cave Defendants have failed to provide consumers:

    a.  A separate, written statement of "Consumer Credit File Rights Under State and Federal Law," in the form and manner required by CROA, before or after any contract or agreement was executed;

    b.  Contracts containing required terms and conditions, including:

        i.  The terms, conditions, and amount of payment;

        ii.  A full and detailed description of the services to be performed, including an estimated date upon which the services would be completed or the length of time necessary to complete the services;

        iii.  The principal business address of Growth Cave;

        iv.  A conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, regarding the consumers' right to cancel the contracts without penalty or obligation at any time before the third business day after the date on which consumers signed

the contracts; or

    c.  A cancellation form in the prescribed manner required by CROA.

176.    Growth Cave Defendants' acts or practices, as described in Paragraph 175, violate CROA, 15 U.S.C. §§ 1679c(a), 1679c(b), 1679d(b), 1679e(b), and 1679e(c), and therefore are deceptive or unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE REVIEWS AND TESTIMONIALS RULE

177.    The Reviews and Testimonials Rule took effect on October 21, 2024, and has since that date remained in full force and effect.

178.    Defendants are individuals and corporations that sell products or services, therefore Defendants are a "business" as defined by the Reviews and Testimonials Rule, 16 C.F.R. § 465.1(a).

179.    To advertise their products and services, Defendants frequently show favorable testimonials from consumers who supposedly purchased Defendants' products or services. Under the Reviews and Testimonials Rule, a "consumer testimonial" is "an advertising or promotional message . . . that consumers are likely to believe reflects the opinions, beliefs, or experiences of a consumer who has purchased, used, or otherwise had experience with a product, service, or business." 16 C.F.R. § 465.1(f). A "testimonialist" is an "individual giving or purportedly giving a consumer testimonial." 16 C.F.R. § 465.1(o).

180.    The Reviews and Testimonials Rule prohibits a business from disseminating consumer testimonials about the business's products or services if the testimonialist is one of the business's officers, managers, employees, or agents, unless the business includes a clear and conspicuous disclosure of the testimonialist's material relationship to the business, when the relationship is not otherwise clear to the audience and the business knew or should have known the testimonialist's relationship to the business. 16 C.F.R. § 465.5(b)(1).

53

181.   Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Reviews and Testimonials Rule constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT FOURTEEN

### Failure to Disclose Material Relationship

### *(Against Defendants Apex Mind, Batte, and Marksberry)*

182.   In numerous instances, through the means described in Paragraph 117, Apex Mind, Batte, and Marksberry have disseminated consumer testimonials about Apex Mind by employees of Apex Mind, when the relationship is not otherwise clear to the audience and Apex Mind, Batte, and Marksberry knew or should have known the testimonialists' relationship with Apex Mind, but did not include a clear and conspicuous disclosure of the testimonialists' material relationship with Apex Mind.

183.   Therefore, Apex Mind, Batte, and Marksberry's acts or practices, as described in Paragraph 182, violate 16 C.F.R. § 465.5(b)(1) and therefore are deceptive or unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

184.   Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the Business Opportunity Rule, CROA, and the Reviews and Testimonials Rule. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

54

A.    Enter a permanent injunction to prevent future violations of the FTC Act, the Business Opportunity Rule, CROA, and the Reviews and Testimonials Rule;

B.    Grant preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions, and an order freezing assets;

C.    Award monetary and other relief within the Court's power to grant;

D.    Award any additional relief as the Court determines may be just and proper.

Dated: February 10, 2025                    Respectfully submitted,

_Maris Snell_

MARIS K.V. SNELL
msnell@ftc.gov
ADRIENNE JENKINS
ajenkins@ftc.gov
Federal Trade Commission
1111 Superior Avenue, Suite 200
Cleveland, OH 44114
Tel: (202) 660-8544
Fax: (216) 263-3426

MILES D. FREEMAN
mfreeman@ftc.gov
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Tel: (310) 824-4300
Fax: (310) 824-4380

*Attorneys for Plaintiff Federal Trade Commission*